**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**LAFAYETTE-OPELOUSAS DIVISION**

| ESTATE OF EVAN CORMIER | * | CIVIL ACTION NO. 07-1439 |
|---|---|---|
| VERSUS | * | JUDGE DOHERTY |
| COMMISSIONER OF SOCIAL SECURITY | * | MAGISTRATE JUDGE HILL |

### REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Evans L. Cormier, born August 26, 1965, filed applications for a period of disability, disability insurance benefits, and supplemental security income on April 22, 2005, alleging disability as of February 13, 2005, due to diabetes mellitus, a history of renal failure, hypertension, and compensated congestive heart failure. One day after the Appeals Council denied claimant's request for review, claimant died on July 7, 2007 from cardiac arrest and complications from his illnesses.[1]

### FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is not substantial

---

[1]After claimant's death, his surviving spouse, Bernadette Cormier, was substituted as plaintiff.

evidence in the record to support the Commissioner's finding that the claimant was not disabled and that this case should be reversed.

In fulfillment of F.R.Civ.P. 52, I find that this case should be reversed, based on the following:

**(1) Records from University Medical Center ("UMC") dated April 24, 1999 to May 20, 2005**. On April 29, 1999, claimant complained of right-sided chest pain and shortness of breath. (Tr. 205-10). An echocardiographic report revealed a moderately dilated left ventricle with slightly reduced function, normal vitral valve, slightly dilated left atrium, normal aortic root, slightly sclerotic aortic valve, and normal right atrium and right ventricle. (Tr. 215). Doppler and color flow doppler studies showed minimal tricuspid regurgitation and 1+ pulmonic insufficiency. The diagnoses were subendocardial infarction, congestive heart failure, uncontrolled Type I diabetes mellitus without complication, essential hypertension under good control, obesity, disorder of the kidney and ureter, anemia, and hyperlipemia. (Tr. 206, 208).

On July 14, 2001, claimant complained of sore legs. (Tr. 160-87). The diagnoses were cellulitis, hypertension, and diabetes. (Tr. 168). He was started on a low calorie, low salt, low protein diet.

On November 21, 2001, claimant had lost more than 100 pounds. (Tr. 153). He had no complaints. The assessment was resolved cellulitis, asymptomatic

hypertension, diabetes mellitus with good diet control, and CRI.

Claimant failed to show for several appointments. (Tr. 149-52). When he returned on July 24, 2002, he was out of medications. (Tr. 148). His hypertension was under good control. His insulin was increased. (Tr. 147).

Afterwards, claimant failed to show for several more appointments. (Tr. 137-42). On April 11, 2005, he complained of swelling. (Tr. 127-28). An ECG showed sinus tachycardia, left atrial enlargement, low voltage QRS, and anteroseptal infarct, age undetermined. (Tr. 136). Chest x-rays showed cardiomegaly. (Tr. 123). The diagnoses were renal failure, congestive heart failure, and diabetes mellitus. (Tr. 128).

On May 17, 2005, claimant complained of pain and swelling to the left leg. (Tr. 110, 114). A knee x-ray was normal. (Tr. 112). A left leg ultrasound showed edematous tissue, but no definite cyst or mass lesion. (Tr. 108). The assessment was left knee pain and effusion. (Tr. 111).

**(2) Consultative Internal Medicine Examination by Dr. Samuel J. Stagg, Jr. dated June 23, 2005**. Claimant gave a history of being diabetic for 14 years. (Tr. 217). He was on insulin until April, 2005, when his medications were changed to oral. He became lightheaded at times.

Claimant had been hypertensive for over 25 years. He had occasional headaches. He did not pass out. He had had a heart attack in 1999, and had had some chest pain since then. He was sent to Shreveport to have stents inserted, and had had no chest pain since then.

Claimant complained of intermittent left knee pain. His left knee gave way, and he had fallen while walking on his porch one week prior. He had fallen for the first time two months prior.

Claimant's last hospitalization was in 2001 for renal failure. His medications included Coreg, Lotrel, Aspirin, Lasix, and Avandia.

On examination, claimant's mental status appeared adequate. He got in and out of a chair without difficulty, and walked with a normal gait. His blood pressure was 130/90, pulse 100, and respirations 20. He was 6 feet 1 inch tall and weighed 193 pounds.

Claimant's vision without glasses was 20/20 in the right eye and 20/30 in the left. His lungs were clear. His heart had a sinus rhythm with no cardiac murmurs, rubs, or thrills. He had no apparent clinic cardiac enlargement. Heart tones were good.

Claimant had no edema of the extremities. (Tr. 218). His pluses were bilateral, equal, and normal. Reflexes were bilateral, equal, and physiologic. He had no

4

apparent muscle weakness or atrophy.

Grip, dexterity, and grasping appeared normal. Claimant had normal range of motion of the upper extremities and knees. Straight leg raising was normal. Claimant had no clubbing or cyanosis of the digits.

Vibratory and fine touch sensation were normal. Claimant walked on his toes and heels without difficulty. He had normal range of motion of the lumbosacral spine.

Claimant reported that he had had a considerable weight loss over the previous year. In April, 2005, he had a creatinine of 2.3 with evidence of some renal failure. Alkaline phosphate was elevated also.

Dr. Stagg's impression was diabetes mellitus, non-insulin dependent; hypertension, etiology undetermined, mild to moderate; chronic renal failure; compensated congestive heart failure, and coronary artery disease with previous stent insertion.

Two views of the chest showed a CT ratio of 16 to 33 centimeters. Heart shadow and bony structure were normal. Lung fields were clear.

**(3) Physical Residual Functional Capacity Assessment Form dated July 26, 2005**. The medical consultant found that claimant was able to lift 50 pounds occasionally and 25 pounds frequently. (Tr. 220). He could stand/walk about six

hours in an eight-hour day. He had unlimited push/pull ability. He had no other limitations. (Tr. 221-23).

**(4) Records from UMC dated May 21, 2005 to January 11, 2006**. On May 24, 2005, claimant was doing much better and was able to walk around. (Tr. 241). The impression was probable venous thrombosis. An echocardiographic report showed that the left ventricle was slightly dilated with significantly reduced function and moderate concentric left ventricular hypertrophy; normal mitral valve; a reversed mitral E to A ratio, consistent with left ventricular diastolic dysfunction; a significantly dilated left atrium; a normal aortic root and valve, and a significantly dilated right atrium and ventricle. Doppler and color flow Doppler cardiac studies revealed mild tricuspid regurgitation, 2+ mitral regurgitation, and 1+ pulmonary insufficiency.

On October 10, 2005, blood tests showed that one of claimant's blood sugar levels was elevated to 590. (Tr. 238, 240). His creatinine was 2.2. (Tr. 240). A representative from UMC called claimant's wife and asked her to bring him to the hospital. (Tr. 238). On December 8, 2005, claimant's glucose level was high at 211, and creatinine was high at 2.0. (Tr. 235).

On January 11, 2006, claimant reported that he had been out of blood pressure medications for more than one month. (Tr. 229). His blood pressure was elevated at

6

148/104. His creatinine was stable. (Tr. 231).

**(5) Post-hearing records dated July 3, 2007 to July 6, 2007**. On July 3, 2007, claimant was admitted for a left great toe diabetic infection. [rec. doc. 12, Exhibit1]. He was brought to surgery on July 6, 2007 for amputation. After surgery, he went into cardiopulmonary arrest. He died later that evening.

**(6) Claimant's Administrative Hearing Testimony**. At the hearing on February 5, 2007, claimant was 41 years old. (Tr. 255). He was 6 feet tall and weighed 250 pounds. He lived with his wife and daughters, ages 6 and 3.

Claimant testified that he drank alcohol occasionally. (Tr. 256). He stated that he had completed high school. He had a driver's license. (Tr. 257). He said that he normally drove about 10 miles.

Claimant reported that he had last worked on January 15, 2007 as a movie theater shift supervisor. (Tr. 257-58). He had worked there since June, 2006. (Tr. 258). He testified that he left because his medicine made him dizzy.

Additionally, claimant had worked as an assistant manager at a theater chain from 1987 to 2005. He had worked as a farmhand with horses and cattle from 1992 to 1997. He had also worked as a cook in 1998.

Claimant alleged that he had become disabled on February 13, 2005, but had worked since that day. (Tr. 259). He stated that he had essentially worked part-time

7

for 20 to 25 hours a week. (Tr. 260).

Regarding complaints, claimant testified that he had diabetes, hypertension, kidney failure, and congestive heart failure. He stated that he had been diagnosed with diabetes in the early 1990s, and took medication to control his blood sugar. (Tr. 261). He also reported that he followed an appropriate diet.

Additionally, claimant complained of pain in his feet. (Tr. 262). He also reported lightheadedness and dizziness. He stated that he was taking two kinds of medication for his blood pressure.

Regarding kidney failure, claimant testified that he kept retaining a lot of fluid. (Tr. 263). He stated that he was taking fluid pills. He reported that he went to the bathroom about five or six times between 8:00 and 11:00 a.m. (Tr. 264). He said that it leveled off during the afternoon, and woke him up two or three times at night.

Additionally, claimant testified that he had congestive heart failure. He stated that he was taking medication to control his irregular heartbeat. He also took aspirin to keep his blood thin, as well as over-the-counter medications for heartburn.

As to activities, claimant testified that he watched television about four hours a day. (Tr. 265, 267). He also swept the floors, washed dishes, did laundry, and went shopping weekly with his wife. (Tr. 265-66). He stated that he was able to lift a gallon of milk. (Tr. 265).

Additionally, claimant visited with friends and relatives about once a week. He also attended church every Sunday. (Tr. 266). He was able to bathe, dress, and groom himself.

Regarding medications, claimant stated that he took insulin, Coreg, Verapamil, Enalapril, Furosemide, and aspirin. (Tr. 268-69). He stated that he became dizzy from his medications. (Tr. 269). He stated that he became a little weak from the insulin sometimes.

As to restrictions, claimant reported that he could walk about four blocks before having to take a break. (Tr. 269-70). He stated that he could stand about 15 minutes. (Tr. 270). He could sit for about an hour.

Claimant stated that he could climb stairs very slowly. He said that he could reach forward and overhead. He could lift about 20 pounds, about six times and hour. He reported that he could stoop, but could not kneel. (Tr. 270-71).

Claimant said that he could grip and pick up small objects. (Tr. 271). He stated that he could concentrate and follow simple one- or two-step instructions. He reported that he became upset around noise.

Additionally, claimant testified that he would not have problems with talking and interacting with supervisors or coworkers. (Tr. 272). He also said that he was nervous around strangers and crowds. He reported that stress bothered him. (Tr.

9

273). He stated that he was able to stay and focused on task. He was bothered by smoke.

**(7) Administrative Hearing Testimony of Beverly Prestonback, Vocational Expert ("VE")**. Ms. Prestonback classified claimant's past work as a farmhand as medium with an SVP of 4; short order cook as light with an SVP of three; stocker as medium with an SVP of 6; assistant manager as light with an SVP of six, and ticket taker as light to medium with an SVP of two. (Tr. 283-84). The ALJ asked the VE to assume a claimant 39 to 41 years old with 12 years of education, and with the exertional ability to perform medium work. (Tr. 284). In response, Ms. Prestonback testified that claimant would be able to perform all of his prior relevant work.

When the ALJ changed the hypothetical to assume a claimant would could lift and carry 20 pounds occasionally and 10 pounds frequently; stand/walk six hours out of eight; had limited push/pull ability to lift and carry, had occasional postural limitations, and had to take six bathroom breaks in the morning and a couple in the afternoon, Ms. Prestonback testified that such claimant would not be able to do the ticket counter part of the job, but could office work, light cooking or short-order cooking activities. (Tr. 285). She further stated that an employee's having six to eight bathroom breaks per day would be beyond an employer's expectations. She further testified that even with multiple bathroom breaks, he could perform work as

a building janitor, light, of which there were 2,800 jobs available statewide and 245,000 nationally, and grounds maintenance worker, of which there 942 jobs available statewide and 78,000 nationally. (Tr. 286).

The ALJ further modified the hypothetical to assume a claimant who could lift and carry 20 pounds occasionally and 10 pounds frequently; stand/walk for six hours out of eight, with the ability to alternate sitting, standing, and walking to account for dizzy spells, and had to take bathroom breaks as needed. (Tr. 287). In response, the VE testified that such claimant would be limited to sedentary office jobs, which he could not do with the frequent bathroom breaks. She further stated that if he were allowed to stand, file, and stretch occasionally, he could probably do a sedentary general office clerk job, of which there were 66,000 jobs nationally and 800 statewide. (Tr. 288), or light office clerk job, of which there were 181,000 jobs nationally and 2,200 statewide. (Tr. 288).

When claimant's attorney asked whether claimant could work if he had to take unscheduled bathroom breaks more than once an hour, the VE testified that he probably could not perform any job. (Tr. 290).

**(8) The ALJ's Findings**. Claimant argues that the ALJ erred in finding that he was capable of making a successful adjustment to other work based on the testimony of the vocational expert, when she concluded that based on the facts in the

record and the ALJ's hypotheticals, claimant could not sustain any gainful work activity. Because I find that claimant was not capable of working on a sustainable basis due to the combination of his severe impairments, I recommend that this case be **REVERSED**, and that claimant be awarded benefits from February 13, 2005 to the time of his death on July 7, 2007.[2]

The record reflects that claimant had several severe impairments which were acknowledge by the ALJ, including diabetes mellitus, a history of renal failure, hypertension, and compensated congestive heart failure. (Tr. 15). However, she found that the objective medical evidence failed to fully support claimant's objective complaints. (Tr. 19). For instance, she noted that his diabetes was well-controlled with his insulin and diet, and that he had suffered no further episodes of cardiac symptomatology since his stent insertion.

However, the ALJ failed to adequately consider the most recent evidence from his treating physicians, including blood tests on October 10, 2005, showing that one of his blood sugar levels was elevated to 590, and a subsequent test on December 8, 2005, showing a high glucose level of 211. (Tr. 235, 238, 240). Additionally, a comparison of the echocardiographic reports shows that claimant's heart condition had declined between 2001 and 2005 from a mild to *moderate* concentric left

---

[2]This is the date of onset alleged by claimant.

ventricular hypertrophy, a moderate to a *significantly* dilated left atrium, and a moderate to a *significantly* dilated right atrium and ventricle. (emphasis added). (Tr. 188, 215, 243).

It is well established that the opinion of a treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995). A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and *is not inconsistent with ... other substantial evidence*." (emphasis added). *Newton,* 209 F.3d at 455 (citing 20 C.F.R. § 404.1527(d)(2)). Good cause for abandoning the treating physician rule includes disregarding statements by the treating physician that are brief and conclusory, not supported by medically accepted clinical laboratory diagnostic techniques, or otherwise unsupported by evidence. *Leggett*, 67 F.3d at 566; *Greenspan*, 38 F.3d at 237.

In this case, the records from claimant's treating physicians at UMC show that claimant's diabetes and cardiac conditions had worsened. The post-hearing evidence,

which was dated *one day* after the Appeals Council's decision, showed that claimant died as a result of cardiac arrest and cardiac complications. (emphasis added). This evidence indicates that claimant's severe cardiac condition existed prior to the Commissioner's final decision. Based on this evidence, the decision of the ALJ should not stand.

Accordingly, it is my recommendation that the Commissioner's decision be **REVERSED**, and the claimant be awarded benefits. The undersigned recommends that and the claimant is awarded appropriate benefits commencing February 13, 2005, the date of onset of disability.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE**

**TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.** *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION,* **79 F.3D 1415 (5TH CIR. 1996).**

Signed September 25, 2008, at Lafayette, Louisiana.

_____
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE